# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### ALEXANDRIA DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION, and<br><br>OFFICE OF THE MARYLAND ATTORNEY GENERAL, CONSUMER PROTECTION DIVISION,<br><br>     Plaintiffs,<br><br>          v.<br><br>LINDSAY CHEVROLET, L.L.C., a limited liability company, also d/b/a Lindsay Chevrolet of Woodbridge,<br><br>LINDSAY FORD, LLC, a limited liability company, also d/b/a Lindsay Ford of Wheaton,<br><br>LINDSAY MOTORS, LLC, a limited liability company, also d/b/a Lindsay Chrysler-Jeep-Dodge-Ram,<br><br>LINDSAY MANAGEMENT COMPANY, LLC, a limited liability company,<br><br>MICHAEL LINDSAY,<br><br>JOHN SMALLWOOD, and<br><br>PAUL SMYTH,<br><br>     Defendants. | **Case No. 1:24-cv-02362**<br><br>**COMPLAINT FOR PERMANENT INJUNCTION, MONETARY JUDGMENT, CIVIL PENALTY JUDGMENT, AND OTHER RELIEF** |

Plaintiffs, the Federal Trade Commission ("FTC"), and the Office of the Maryland Attorney General, Consumer Protection Division (the "Division"), for their Complaint allege:

1.     The FTC brings this action for Defendants' violations of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).  Defendants' violations relate to deceptive and unfair practices in the

1

advertising, marketing, promotion, offering for sale, lease or financing, and sale, lease, or financing of motor vehicles.  For these violations, the FTC seeks relief, including a permanent injunction and other relief, pursuant to Section 13(b) of the FTC Act, 15 U.S.C. § 53(b).

2.      The Division brings this action under Maryland's Consumer Protection Act ("CPA"), Md. Code Ann., Com. Law §§ 13-101 through 13-501 (LexisNexis Supp. 2023), to enjoin Defendants from engaging in unfair or deceptive trade practices in the course of offering and selling vehicles to consumers in the State of Maryland, and to obtain relief for those consumers victimized by Defendants' unlawful practices.

## JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345.

4.      Supplemental jurisdiction over the State of Maryland's claims is proper under 28 U.S.C. § 1367.

5.      Venue is proper in this District under 28 U.S.C. § 1391(b)(2), (c)(1), and (c)(2), and 15 U.S.C. § 53(b).

## PLAINTIFFS

6.      The FTC is an independent agency of the United States Government created by the FTC Act, which authorizes the FTC to commence this district court civil action by its own attorneys.  15 U.S.C. §§ 41–58.  The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce.

7.      The Consumer Protection Division of the Office of the Attorney General of Maryland is responsible for enforcement of Maryland's consumer protection laws, including the CPA.  The CPA prohibits unfair, abusive, or deceptive trade practices in the sale, or offer for sale, of consumer goods. *See* CPA § 13-301.

**DEFENDANTS**

8.      Defendant Lindsay Chevrolet, L.L.C., also doing business as Lindsay Chevrolet of Woodbridge ("Lindsay Chevrolet"), is a Virginia limited liability company with its principal place of business at 15605 Richmond Highway, Woodbridge, VA 22191.  Lindsay Chevrolet transacts or has transacted business in this District.

9.      Defendant Lindsay Motors, LLC, also doing business as Lindsay Chrysler-Dodge-Jeep-Ram ("Lindsay CDJR"), is a Virginia limited liability company with its principal place of business at 8100 Centreville Road, Manassas, VA 20111.  Lindsay CDJR transacts or has transacted business in this District.

10.     Defendant Lindsay Ford, LLC, also doing business as Lindsay Ford of Wheaton ("Lindsay Ford"), is a Maryland limited liability company with its principal place of business at 11250 Veirs Mill Road, Wheaton, MD 20902.  Lindsay Ford transacts or has transacted business in this District.

11.     Defendant Lindsay Management Company, LLC ("Lindsay Management") is a Virginia limited liability company with its principal place of business at 3410 King Street, Alexandria, VA 22302.  Lindsay Management provides operational services to Lindsay dealerships, including building maintenance, payroll, IT services, inventory management, employee training, marketing, and human resources management.  Lindsay Management also paid the Defendant dealerships' civil penalties for law violations assessed by the Motor Vehicle Dealer Board of Virginia.  Lindsay Management Company, LLC transacts or has transacted business in this District.

12.     Defendants Lindsay Chevrolet, Lindsay CDJR, Lindsay Ford, and Lindsay Management are hereinafter referred to collectively as the "Corporate Defendants."

3

13.     Defendant Michael Lindsay is part-owner and president of Lindsay Management, Lindsay Chevrolet, Lindsay CDJR, and Lindsay Ford.  At all times relevant to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices described in this Complaint.  For example, Defendant Lindsay is responsible for hiring and firing senior employees such as the chief operating officer and general manager.  He approves dealership budgets and attends regular meetings to discuss dealerships' general operations, compliance, and advertising.  He has also regularly received complaints regarding the practices described in this Complaint.  Defendant Michael Lindsay resides in this District and, in connection with the matters alleged herein, transacts or has transacted business in this District.

14.     Defendant John Smallwood is Chief Operating Officer of Lindsay Management. At all times relevant to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices described in this Complaint.  For example, Defendant Smallwood is responsible for implementing company strategies into daily operations at Lindsay Chevrolet, Lindsay CDJR, and Lindsay Ford.  He has also regularly received complaints regarding the practices described in this Complaint.  Defendant Smallwood is often personally involved in communicating with consumers who complain about Defendants' practices.  Defendant Smallwood, in connection with the matters alleged herein, transacts or has transacted business in this District.

15.     Defendant Paul Smyth is General Manager of Lindsay Chevrolet, Lindsay CDJR, and Lindsay Ford.  At all times relevant to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices described in this Complaint.  For example, Defendant Smyth oversees the day-to-

day operations of the Defendant dealerships, sets compensation structures for dealership employees, and designs, modifies, and implements policies and training regarding the sale of add-ons and financing. He has also regularly received complaints regarding the practices described in this Complaint. Defendant Smyth resides in this District and, in connection with the matters alleged herein, transacts or has transacted business in this District.

16.    Defendants Michael Lindsay, Smallwood, and Smyth are hereinafter referred to collectively as the "Individual Defendants."

## COMMON ENTERPRISE

17.    The Corporate Defendants have operated as a common enterprise while engaging in the deceptive and unfair acts and practices alleged below. Corporate Defendants conduct the business practices described below through an interrelated network of companies that have common ownership, officers, managers, employees, business functions, advertising, and office locations. Because these Corporate Defendants have operated as a common enterprise, each of them is liable for the acts and practices alleged below.

## COMMERCE

18.    At all times relevant to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## DEFENDANTS' BUSINESS ACTIVITIES

19.    Defendants are the owners and operators of Lindsay Management and Lindsay Chevrolet, Lindsay CDJR, and Lindsay Ford, three automobile dealerships located in the greater Washington, DC metropolitan region and collectively doing business as the "Lindsay Automotive Group" (hereinafter, "Lindsay"). Lindsay has systematically engaged in a pattern of unlawful conduct harming consumers seeking to purchase, finance, and lease motor vehicles.

Lindsay's illegal practices take several forms.  First, Lindsay tricks consumers into visiting its dealerships by touting low prices in online advertisements.  However, Lindsay does not honor these prices.  Instead, in numerous instances, Lindsay charges consumers thousands of dollars more than the advertised price.  Second, Lindsay often falsely claims that consumers must pay additional fees to purchase a vehicle if they do not finance through Lindsay, for which Lindsay receives monetary "kickbacks."  Third, in many instances, Lindsay tacks fees for unwanted add-ons such as service contracts, GAP coverage, or extended warranties onto consumers' deals either without consumers' consent or after falsely telling consumers those add-ons are required.  Lindsay's practices are so pervasive that, according to a survey of Lindsay customers who were charged for add-ons, 68% were charged for at least one add-on they did not agree to buy or were falsely told was required.  As a result of these unlawful practices, Lindsay has overcharged consumers by millions of dollars.

**Lindsay's Deceptive Advertising**

20.    Lindsay lures consumers to its dealerships by advertising low prices for specific motor vehicles on its website and third-party websites.  For example, in an advertisement on Lindsay's website, below, Lindsay represents that consumers can purchase a 2024 Chevrolet Silverado 1500 at the "Lindsay Love It Price" of $42,990:

6



21.     Many consumers shopping for a motor vehicle view these low prices and believe that Lindsay will sell them the advertised vehicle for the advertised price.  Moreover, when consumers call the dealership to confirm the advertised price, in many instances, Lindsay employees falsely claim that the advertised price is available to all consumers, and not subject to any qualifying incentives, rebates, or significant additional fees.

22.     Many consumers take time off work, brave rush-hour traffic, or spend their weekends traveling from hours away at significant expense to get to Lindsay's dealerships after seeing their advertisements and confirming their prices.  Once at the dealership, consumers often spend significant time viewing and test-driving vehicles.  After selecting a vehicle, they sit down to discuss the terms of the purchase.  According to Lindsay's Marketing Manager, "statistically the customer is ours to lose at that point."

23.     In numerous instances, only at this point does Lindsay inform consumers that the price is hundreds or thousands of dollars more than the price it advertised.  In fact, the overwhelming majority of consumers who purchase a vehicle at a Lindsay dealership pay more than the advertised price.  For example, a random sample of Lindsay's transactions from April 2020 through March 2023 shows that, of the vehicles Lindsay advertised and priced on third-party sites CarGurus.com and Cars.com, *over 88% of consumers* paid more than the advertised price. And of those consumers, most paid *over $2,000 more*.

24.     Lindsay often refuses to honor its advertised prices because it claims the consumer does not qualify for a litany of previously undisclosed rebates and incentives included in its price, such as loyalty, active-duty military, first responder, and education discounts.  For example, Lindsay Chevrolet told a consumer it would not sell him a vehicle at the advertised price because the consumer would have to be in the military, a firefighter, and a first responder simultaneously to get that price.  The consumer, himself a first responder, observed, "you have to be a Superman/Superwoman to master all three at one time!"  At Lindsay CDJR, a manager informed another consumer that the price on the website "was not realistic" and that "no one would qualify for it because it was nearly impossible to qualify for all the rebates to get to that price."  Another manager told her the "real" price was over $4,000 more than advertised.

25.     Lindsay refuses to honor its advertised prices for other purported reasons as well. For example, in numerous instances, it tells consumers they must pay thousands of dollars in additional fees to purchase the vehicle.  One consumer drove 1½ hours to Lindsay Ford after seeing attractive prices on Lindsay's website only to be told she would have to pay an extra $2,000 fee for "Blue Oval," which she was told was a "standard charge that the Ford company puts on there."  Another consumer viewed Lindsay Chevrolet's advertisements online, but when

he got to the dealership, was required to purchase a "Blazer Package" he did not want or need for an additional $1,799 fee. When the consumer attempted to have the fee removed, a salesperson told him Lindsay always "tacks on" the fee to ensure he would get maintenance. Another consumer drove 70 miles to Lindsay CDJR to look at a car advertised for $24,500. Once there, the consumer learned the dealership added a mandatory $1,750 fee for "CPO, air filter, and floor mats." In another instance, a consumer complained that Lindsay CDJR added numerous fees to the advertised price, including a "Mopar package" and freight on a used car. When consumers ask to have these fees removed, or to purchase a vehicle at the advertised price without the additional fees, they are falsely told the fees are required.

26.     In still other instances, employees provide no explanation for the price discrepancies at all. For example, Lindsay told one consumer who tried to pay the advertised price simply that the consumer "should be smart enough to know that they cannot sell the truck for that price."

27.     Consumers often invest significant time and money in visiting Lindsay dealerships only to be told that Lindsay will not honor its advertised prices. For example, one consumer booked a flight from Pennsylvania after seeing Lindsay Chevrolet's advertised price of $42,538 for a Chevrolet Camaro, which included a $9,337 discount available to everyone. Once the consumer was at the dealership, a Lindsay employee refused to sell the vehicle for the advertised price and demanded thousands of dollars more mid-transaction because the consumer supposedly did not qualify for Military, GM Lease, or Mustang owner discounts of $3,950. The consumer ultimately paid $5,445 more than Lindsay's advertised price. Lindsay's salesperson even told the consumer he was naïve to expect to pay the advertised price. In another instance, a consumer called to confirm the advertised price of a car with a Lindsay employee before driving

3½ hours with his wife to see it. Once at the dealership, the employee and his manager revealed the consumer would have to buy a $2,995 protection package the employee claimed was included on every car sold. The consumer—himself a manager in an auto dealership—walked out of Lindsay Chevrolet empty-handed and "blown away" by the dealership's conduct.

28.    Lindsay has long been aware that its price claims mislead consumers. For example, one manager at Lindsay Ford complained internally about Lindsay's artificially low advertised prices, admitting, "we list everything online with a ridiculous price that is so far out of reality it[']s embarrassing." Lindsay also admitted to the Virginia Motor Vehicle Dealer Board that one of its prices required two conditions that were virtually impossible to satisfy — namely that, to qualify, the consumer had to both already have a vehicle, but also to have never purchased a vehicle before.

29.    Many of Lindsay's advertisements do not mention qualifying rebates or additional fees at all. Other advertisements mention rebates in buried, fine print that is itself misleading. For example, a consumer viewing a vehicle listing on Lindsay Chevrolet's website would have to scroll through four screens, past content unrelated to the vehicle being advertised, to see the following confusing set of statements about Lindsay's pricing, which in fact suggest that a consumer may be eligible to receive additional discounts:

> Please contact the dealer for additional manufacturer rebates that may be available and could further reduce your price! "Love It" prices include current manufacturer rebates and factory incentives, some of which may require financing through the manufacturer and are therefore subject to credit approval. Additional factory rebates from certain manufacturers, such as first time buyers, recent college graduates, veterans and/or active members of the military, owners of competitive makes, loyalty rebates etc, may be available. "Love It" pricing may not be compatible with special factory financing. "Love It" prices are valid based on manufacturer incentive program time periods.
>
> We make every effort to provide accurate information, but please verify options and price before purchasing. All vehicles are subject to prior sale. All prices are special internet prices only. All financing is subject to approved credit. All new vehicle prices exclude freight. Tax, tags, and processing fee of $999 in Virginia additional.

30.    Many of Lindsay's sales require the consumer to pay a dealer processing charge. That dealer processing charge is not included in the advertised price. Instead, the following is an

10

example of how Lindsay disclosed its dealer processing charge in Maryland, in small, remote, unbolded typeface:

2024 Ford Mustang GT Premium VIN #: 1FA6P8CF2R5430588 (Model #: P8C). MSRP $51,590 Advertised prices conform with Ford pricing guidelines for advertising. There may be additional discounts available, which can be verified by a call, email, text, online price request or by visiting our showroom. All prices, specifications, and availability are subject to change without notice. While reasonable effort is made to ensure the accuracy of the information on this site, absolute accuracy is not warranted or guaranteed, and errors do occur. Please verify all information regarding the vehicle with a customer service representative by calling us at 301-273-7314 or by visiting us at the dealership. Prices are subject to availability and are limited to vehicles in inventory. Tax, Title, Tags, and $800 documentation fee are not included in vehicle prices shown and must be paid by the purchaser. We apologize that availability of some equipment, options, or features may be limited due to global supply issues affecting the auto industry. Please be sure to verify that the vehicle you purchase includes all expected features and equipment. Did you arrive on this site from an advertisement not generated by the Dealer s website? The Dealer makes no guarantees or warranties, either expressly or implied, with respect to the accuracy of any data listed or obtained from third party sources. For best options and pricing, please contact us with vehicle you re considering, as well as your eligibility for additional savings programs. Offers generally require financing or leasing and are therefore subject to credit approval.

### Lindsay's Unlawful Financing and Add-on Practices

31.     After consumers have gone through the long process of choosing a vehicle at the dealership and negotiating the price of the vehicle, consumers must meet with a Lindsay finance manager to finalize the purchase, even if they are not seeking financing.  In many instances, consumers must wait a significant amount of time to get into the finance and insurance office. Once consumers sit down, there is often a discussion of the financing terms, during which time Lindsay often misrepresents that consumers must rely on Lindsay to secure financing or employs other unlawful tactics.  Lindsay then presents consumers with a stack of complex, highly technical documents and rushes consumers through the closing process, which typically requires consumers to sign their name in over a dozen places.  In many instances, Lindsay sneaks in unauthorized charges for add-ons that consumers have not consented to, or falsely claims these add-ons are required.

*Lindsay Falsely Claims Consumers Must Finance Through The Dealership*

32.     Consumers purchasing a car typically fund the purchase in one of three ways. First, consumers may purchase the vehicle in cash (including through a cashier's or personal check).  Second, consumers may arrange financing through a financial institution themselves — typically by obtaining a "preapproval" quote from their preferred financial institution prior to

11

arriving at a dealership and using this financing financial institution to pay for their chosen vehicle.  Lindsay does not receive compensation on the financing portion of the vehicle sale transaction when a consumer arranges financing themselves.  Third, consumers may rely on the dealership to arrange financing for the purchase through a third-party financing entity while the consumer is at the dealership.  Lindsay managers describe compensation Lindsay receives through this type of financing as "a kickback."

33.     In numerous instances, Lindsay employees falsely claim that, in order to purchase a vehicle or obtain the advertised price, consumers must use Lindsay to arrange the financing. After being told this, many consumers either leave empty-handed after having invested significant time and expense, or acquiesce and finance through the dealership at greater cost than other options.  Even in rare instances where consumers successfully negotiate to use their own financing, they often invest significant time and bargaining power in negotiating to do so.

34.     For example, one consumer who attempted to pay cash for a used vehicle from Lindsay Chevrolet was told it was "mandatory" that he take out financing from the dealership, which the consumer neither wanted nor needed.  Another consumer went to Lindsay Chevrolet after finding a car Lindsay had advertised for $21,200 on her credit union's car buying website. The consumer obtained a preapproval for financing through her credit union at 4.99% for 60 months based on the advertised price, which she had confirmed with Lindsay employees.  Once the consumer arrived at the dealership, however, one of the employees told her, "We can't really give you that price. You would need to finance through us," even though Lindsay had advertised that price on a credit union's website.  The consumer spent hours at the dealership between the test drive and going through the process of obtaining financing a second time and ended up with a loan at 7.39% for 66 months.  The higher interest rate and loan terms on Lindsay's financing

would cost the consumer an additional $2,180 over the life of the loan.  The consumer later discovered that Lindsay had also charged her $24,776.93 for a car they had advertised for $21,200, even though the consumer ultimately *had* financed with Lindsay – the supposed condition for obtaining the advertised price.

35.	Another consumer went to purchase a vehicle advertised by Lindsay Ford.  Once the consumer informed a Lindsay employee that he had his own financing, the employee told him he could only receive the advertised price if he financed through the dealership.  The consumer noted that this requirement was not listed anywhere, and Lindsay employees refused to provide it in writing.  A manager came over and said he could "guarantee" that his banks could match or beat the interest rate offered by the consumer's credit union, so the consumer agreed to complete the application.  The manager then returned with a rate that was 2.5% higher than the consumer's credit union and told the consumer that if he used his own financing the cost of the car would increase by $2,000.

36.	Yet another consumer who viewed Lindsay's advertised prices traveled 40 miles to Lindsay CDJR with her own financing in hand, only to be told by a manager that the advertised price was not the price if the consumer used her own financing.  The consumer went back to the vehicle listing and confirmed no such limitation had been stated.  The consumer left emptyhanded.

37.	According to a survey of consumers who purchased a vehicle from Lindsay, over 38% were told financing through the dealership was required to purchase a vehicle or obtain the advertised price.  Nearly all of these consumers ultimately financed through Lindsay, even if they initially brought their own financing.

38.     Lindsay has admitted that, contrary to its claims, consumers are permitted to bring their own financing when purchasing a vehicle from Lindsay.  For example, Lindsay has confirmed to an advertising partner that its advertised prices are not contingent on financing through Lindsay, though Lindsay is aware that consumers have been told the opposite.

*Lindsay's Unauthorized and Deceptive Add-on Charges*

39.     In numerous instances, Lindsay employees charge consumers for add-ons such as GAP coverage, service contracts, maintenance contracts, and dent protection that they did not consent to purchase, or after falsely telling consumers that the add-ons are mandatory.  These charges often amount to hundreds or thousands of dollars for each consumer.

40.     In numerous instances, Lindsay has included add-on charges on consumers' deals that consumers never agreed to purchase.  Because the add-ons are typically added to the amount financed, spread out over monthly payments, and buried in stacks of paperwork, unauthorized add-on charges are difficult to detect.

41.     For example, one consumer who went to Lindsay Chevrolet had been at the dealership for hours by the time she was signing the paperwork to complete the transaction.  She later discovered Lindsay had charged her $3,687 for a service contract she had never agreed to pay for, in addition to charging her $24,776.93 for a car Lindsay had advertised for $21,200. Another consumer went to Lindsay Ford and selected a Ford F-150 for purchase.  When she got to the finance office, she was offered a tire and rim product, which she expressly declined. Nonetheless, when the consumer returned home, she discovered that she had been charged for this add-on.  Yet another consumer who went to Lindsay Chevrolet was charged $1,200 for GAP coverage and $3,102 for a vehicle service contract she did not agree to, for a total of $4,302 in unauthorized add-ons.  Upon discovering she had been charged for these products, she called,

14

texted, and emailed the dealership attempting to cancel the products, but her communications went unanswered.

42. In numerous instances, Lindsay employees falsely tell consumers that add-on products or packages are required to purchase a vehicle, even though they were not included in the low prices Lindsay advertised. For example, a Lindsay employee told one consumer who went to Lindsay Chevrolet that the manufacturer required him to purchase paint protection on the vehicle he was interested in. Another consumer who traveled around 100 miles from Richmond, Virginia to Lindsay CJDR was told she could not finance the vehicle she had selected at the monthly payment she was looking for unless she purchased a warranty through the dealership.

43. According to a survey of Lindsay's customers who were charged for add-ons, 68% were charged for at least one add-on they did not agree to buy or were falsely told was required.

**Defendants' Violation of Maryland State Dealer Advertising Laws**

44. The Maryland Transportation Article, MD. CODE ANN., TRANSP. § 15-101, *et seq.* (LexisNexis Supp. 2023) and its corresponding regulations regulate vehicle dealers in Maryland, including through consumer protections that prohibit dealers from misleading consumers about vehicle pricing.

45. Under TRANSP. § 15-313(a), a "dealer or an agent or employee of a dealer may not use any advertisement that is in any way false, deceptive, or misleading."

46. The Transportation Article makes clear that it is false, deceptive, and misleading for a dealer to advertise "the purchase price of a vehicle" when that advertised price is not "the full delivered purchase price of the vehicle, excluding *only* taxes, title fees, and any freight or dealer processing charge..." TRANSP. § 15-313(c)(1)(i) (emphasis added).

15

47. Defendants' advertising practices, set forth above, violate TRANSP. § 15-313(c)(1)(i) when they advertised purchase prices for vehicles on their website that did not include the "full delivered purchase price of the vehicle" other than charges for taxes and title fees. For each vehicle advertised for sale on its website, Defendants prominently displayed a "Love It Price." However, that advertised price did not include all of the fees and amounts that Defendants required consumers to pay to purchase a motor vehicle, other than taxes and title fees, which amounts were well above the "Love It Price" that they had advertised.

**The Individual Defendants' Responsibility for the Unlawful Conduct**

48. The Individual Defendants are aware of the ongoing, unlawful practices described in this Complaint. As owners, operators, and executives of the Corporate Defendants, the Individual Defendants also have the authority to stop Lindsay's unlawful practices. Nevertheless, Lindsay's misconduct has persisted.

49. The Virginia Motor Vehicle Dealer Board ("MVDB") has cited the Lindsay dealerships for these unlawful practices at least four separate times, going back over a decade. In 2013, following multiple complaints, the MVDB warned Lindsay Chevrolet that its practice of advertising prices that include rebates, incentives, or dealer discounts unavailable to all consumers violates Virginia law. In 2015, the MVDB assessed a civil penalty against Lindsay Chevrolet for the same conduct. Lindsay Chevrolet was cited and fined yet again in 2022 for advertising one price but then telling consumers they had to pay additional, supposedly mandatory "Blazer" fees. And as recently as January 2024, the MVDB cited Lindsay CDJR for failing to honor its advertised prices. Defendants Michael Lindsay and Paul Smyth received these citations. Nevertheless, Defendants' unlawful advertising practices have continued after these warnings, citations, and fines.

16

50.     The Individual Defendants also sent and received emails about these misleading claims.  In July 2020, Defendant Michael Lindsay told Defendant Smallwood and others, "The biggest complaints that I receive come from the 'Lindsay Love It Price' that we advertise at some of our dealerships.  In short, we never deliver the vehicle anywhere near the stated price.  Even my friends have chided me for it."  Defendant Michael Lindsay forwarded a General Sales Manager's explanation of a "Lindsay Love It Price," which included a "lease" rebate, a "military" rebate, an "educator" rebate, and a "college" rebate.  He complained—not of the way prices were advertised before luring consumers to the lot—but of the "manager's inability to explain it or present it in a fashion that makes sense. . . . It was nothing but diarrhea and leaves a customer with a similar taste in their mouths for us."  Defendants' unlawful advertising practices continued after this exchange.

51.     Numerous consumers have complained directly to the Individual Defendants about Lindsay's deceptive claims, yet even after flagging the misconduct, they have allowed it to continue for years.  For example, Defendant Michael Lindsay received a complaint in May 2021 that Lindsay CDJR had added thousands of dollars in fees to the advertised price.  He did not direct the dealerships to start advertising prices accurately, or to stop adding thousands to the price.  Instead, he simply forwarded the complaint to Defendant Smallwood, writing "I know we keep talking about this but I don't like the way we're doing business at some of our dealerships.  These complaints are too frequent.  We need to come up with a better way to present the price.  Do you agree?"  Defendant Smallwood responded, "Let me look."  But Defendants' unlawful advertising practices continued after this exchange, and Individual Defendants have continued to receive complaints about Lindsay's misconduct.

17

52.    In September 2022, a consumer posted an online video complaining that Lindsay Chevrolet tried to sneak in a charge for a $2,500 "Blazer" package into his purchase. The consumer explains that once he questioned the fee, an employee told him that the package was not optional. The consumer left without purchasing the vehicle. Two weeks after the video was posted, Lindsay's Chief Marketing Officer (CMO) alerted Defendants Smyth and Smallwood that the video had 7.4 million views and said, "This problem is only escalating." The CMO noted that the name "Blazer" had been "tainted in social media" and recommended changing the name of the "optional" product to "protection package." Another Lindsay executive forwarded the internal discussion of the video to Defendant Michael Lindsay with the comment, "Same stuff as always." Subsequent consumers have traveled to Lindsay Chevrolet of Woodbridge in the weeks and months after this incident only to be told that the dealership's "protection package"—now a whopping $3,000—is required to purchase.

53.    Others in the auto industry have flagged Lindsay's deceptive advertising, sales, and financing practices for the Individual Defendants. In an exchange forwarded to Defendant Paul Smyth, a third-party advertising site contacted one of Defendant Michael Lindsay's other dealerships in July 2020 stating the site had determined the dealership's prices were conditional on financing and noted that the dealership must provide "full cash prices that do not include the financing discount, any additional incentives, or rebates dependent on financing." The site explained their pricing policy "is trying to avoid showing pricing that includes a laundry list of incentives most shoppers won't qualify for." Separately, Lindsay's third-party add-on provider contacted Defendants Smallwood and Smyth in December 2020 to inform them that Lindsay "might be misrepresenting products at the time of sale" and scheduled mandatory training for Lindsay employees. Other dealers have also been surprised by Lindsay's conduct. One dealer

18

sent a consumer to Lindsay CDJR to complete a purchase, only to have a Lindsay salesperson quote a retail price that was, according to the dealer, "a complete fiction," and add a warranty and service contract the consumer did not want or need. The dealer complained to Defendant Paul Smyth that Lindsay's conduct was why consumers are "increasingly dissatisfied with 'the dealership experience'. . . ." Despite all of these exchanges and warnings, Lindsay's unlawful practices have continued.

54. Based on the facts and violations of law alleged in this Complaint, the FTC has reason to believe that Defendants are violating or are about to violate laws enforced by the FTC.

## VIOLATIONS OF THE FTC ACT

55. Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

56. Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

57. Acts or practices are unfair under Section 5 of the FTC Act if they cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition. 15 U.S.C. § 45(n).

## Count I

### Misrepresentations Regarding Advertised Prices
### (By Plaintiff FTC against all Defendants)

58. In numerous instances in connection with the advertising, marketing, promotion, offering for sale, lease, or financing, or sale, lease, or financing of motor vehicles, including through the means described in Paragraphs 20 through 29, Defendants represent, directly or

19

indirectly, expressly or by implication, that Defendants will sell particular vehicles at specific prices.

59.     In fact, in numerous instances in which Defendants have made the representations described in Paragraph 58, Defendants do not sell those vehicles at those prices.

60.     Therefore, Defendants' representations as described in Paragraph 58 are false or misleading and constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

### Count II

**Misrepresentations Regarding Financing**
**(By Plaintiff FTC against all Defendants)**

61.     In numerous instances, in connection with the advertising, marketing, promotion, offering for sale, lease, or financing, or sale, lease or financing of motor vehicles, including through the means described in Paragraphs 32 through 33, Defendants represent, directly or indirectly, expressly or by implication, that consumers are required to arrange financing through Defendants' dealerships to purchase a vehicle or to obtain a vehicle at the advertised price.

62.     In fact, in numerous instances in which Defendants have made the representations described in Paragraph 61, consumers are not required to arrange financing through Defendants' dealerships to purchase a vehicle or to obtain a vehicle at the advertised price.

63.     Therefore, Defendants' representations as described in Paragraph 61 are false or misleading and constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## Count III

### Misrepresentations Regarding Add-On Charges
### (By Plaintiff FTC against all Defendants)

64. In numerous instances, in connection with the advertising, marketing, promotion, offering for sale, lease or financing, or sale, lease or financing of motor vehicles, including through the means described in Paragraphs 39 through 43, Defendants represent, directly or indirectly, expressly or by implication, that consumers are required to buy one or more add-ons.

65. In fact, in numerous instances in which Defendants have made the representations described in Paragraph 64, consumers are not required to buy one or more add-ons.

66. Therefore, Defendants' representations as described in Paragraph 64 are false or misleading and constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## Count IV

### Misrepresentations Regarding Charges
### (By Plaintiff FTC against all Defendants)

67. In numerous instances, in connection with the offering for sale, lease, or financing, or sale, lease or financing of motor vehicles, Defendants represent, directly or indirectly, expressly or by implication, that the charges appearing on consumers' sales contracts are authorized by consumers.

68. In fact, in numerous instances in which Defendants have made the representations described in Paragraph 67, the charges appearing on consumers' sales contracts include charges not authorized by consumers.

21

69.    Therefore, Defendants' representations as described in Paragraph 67 are false or misleading and constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

### Count V

**Unfair Practices Relating to Add-On Charges**
**(By Plaintiff FTC against all Defendants)**

70.    In numerous instances, Defendants charge consumers for add-ons without obtaining consumers' express, informed consent.

71.    Defendants' acts or practices cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition.

72.    Therefore, Defendants' acts or practices as described in Paragraph 70 constitute unfair acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. § 45(a), (n).

### VIOLATIONS OF THE MARYLAND CONSUMER PROTECTION ACT

73.    The Division incorporates paragraphs 1 through 72 as if they were fully alleged herein.

74.    Defendants are "merchants" pursuant to CPA § 13-101(g).

75.    The motor vehicles and related service packages that Defendants offer and sell to consumers are for used for personal, family and household purposes, and, therefore, are consumer goods and services pursuant to CPA § 13-101(d).

76.    A deceptive trade practice is a violation of the CPA regardless of whether any consumer has been misled, deceived, or damaged because of the practice.  CPA § 13-302.  A sales practice is unfair or deceptive and violates the CPA if it has the tendency, capability or effect of misleading consumers.

22

77. Violations of the CPA can be redressed through an order requiring the violator to cease and desist from the violation and to take affirmative action, including the restitution of money or property. CPA § 13-403(b)(1)(i). A violator may also be ordered to pay the costs of the action and a penalty of up to $10,000 for each of its violations. CPA §§ 13-409 and 13-410.

78. Section 13-303 of the CPA prohibits a person from engaging in any unfair or deceptive trade practice, as defined by the CPA, in connection with the offer, sale, lease or rental of any consumer good or consumer services. As is set forth more fully below, Defendants committed unfair and deceptive trade practices prohibited by § 13-303 of the Consumer Protection Act, as defined by § 13-301(1) and 13-301(3) of the CPA.

**Count VI**

**Deceptive Practices**
**(By Plaintiff Division against Defendants Lindsay Ford, LLC, Lindsay Management Company, LLC, Michael Lindsay, John Smallwood, and Paul Smyth)**

79. The Division incorporates paragraphs 1 through 78 as if they were fully alleged herein.

80. Defendants make false and misleading statements to consumers, both express and implied, that have the capacity, tendency, or effect of deceiving or misleading consumers, and are deceptive trade practices prohibited by § 13-303 of the CPA, as defined in § 13-301(1) of the CPA, when they do the following things:

    a. Misrepresent that they will sell particular vehicles at specific prices when, in numerous instances, they do not;

    b. Misrepresent that consumers are required to arrange financing through Defendants' dealerships in order to purchase a motor vehicle or to obtain a motor vehicle at the advertised price, when they are not;

c.  Mispresent that consumers are required to purchase one or more add-ons, when they are not;

d.  Misrepresent that the charges appearing on consumers' sales contracts are authorized by the consumers, when they are not; and

e.  Deceptively charge consumers for one or more add-ons that the consumer has not agreed to purchase.

## Count VII

**Deceptive Practices**
**(By Plaintiff Division against Defendants Lindsay Ford, LLC, Lindsay Management Company, LLC, Michael Lindsay, John Smallwood, and Paul Smyth)**

81.  The Division incorporates paragraphs 1 through 80 as if they were fully alleged herein.

82.  Defendants fails to state material facts to consumers, the omission of which deceives or tends to deceive consumers and are therefore deceptive trade practices prohibited by § 13-303 of the CPA, as defined in § 13-301(3) of the CPA, when they do the following things:

a.  on their website, when they advertise purchase prices for their vehicles without disclosing all amounts consumers are required to pay to purchase the vehicle, other than charges for taxes, title fee; and

b.  on their website, when they do not include processing charges in the "Love It Price" that they advertise, and deceptively fail to provide the disclosure of such fees required by Maryland law.

24

## Count VIII

**Unfair Trade Practices**
**(By Plaintiff Division against Defendants Lindsay Ford, LLC, Lindsay Management Company, LLC, Michael Lindsay, John Smallwood, and Paul Smyth)**

83. The Division incorporates paragraphs 1 through 82 as if they were fully alleged herein.

84. Defendants engage in unfair trade practices in their offer and sale of motor vehicles and related services to consumers, in violation of § 13-303 of the CPA.

85. Defendants' practices set forth above have and are likely to cause substantial injury to consumers.  Consumers were and are substantially harmed each time they paid or pay fees that were or are not adequately disclosed or explained and/or that were illegal.  Consumers were and are substantially harmed each time they were or are misled into purchasing goods or services they do not know of, do not want, do not understand the cost of, or were or are misleadingly told are mandatory to purchase.  Consumers were and are substantially harmed each time they were or are charged without their express, informed consent.  Consumers were and are substantially harmed each time they were and are misled into entering financing arrangements at these terms.

86. Consumers who purchase Defendants' goods and services cannot reasonably avoid their injuries because of Defendants' misrepresentations and omissions of material fact.

87. The injuries that consumers have suffered and are suffering as a result of Respondents' actions are not offset by any benefit to consumers or to competition and are unfair trade practices that violate § 13-303 of the CPA.

**CONSUMER INJURY**

88.     Consumers are suffering, have suffered, and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act and the CPA.  Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers and harm the public interest.

**PRAYER FOR RELIEF**

Wherefore, Plaintiffs request that the Court:

A.     Enter a permanent injunction to prevent future violations of the FTC Act and the CPA;

B.     Award such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the CPA, including, but not limited to, the disgorgement and restitution to consumers of all moneys that Defendants received in connection with their unfair or deceptive trade practices and payment of all other economic damages incurred by these consumers in connection with Defendants' unfair or deceptive trade practices, pursuant to Md Code Ann., Com. Law § 13-403(b)(1)(i);

C.     Require Defendants to pay the costs of this action, including all costs of investigation, pursuant to Md. Code Ann., Com. Law § 13-409;

D.     Require Defendants to pay a civil penalty pursuant to Md. Code Ann. Com. Law § 13-401(a) of up to $10,000 for each violation Defendants committed of the CPA;

E.     Hold that all Defendants are jointly and severally liable for the restitution, penalties, costs, and any other sanctions or required payments arising from or relating to this action; and

F.     Award any additional relief as the Court determines to be just and proper.

Dated: December 27, 2024                    Respectfully submitted,

                                            FEDERAL TRADE COMMISSION

                                            /s/ Mary Weaver (with permission)
                                            MARY WEAVER
                                            EVAN ZULLOW
                                            SARAH T. ABUTALEB
                                            Federal Trade Commission
                                            600 Pennsylvania Avenue NW
                                            Mail Stop CC-10232
                                            Washington, D.C. 20580
                                            Phone: 202-326-2145 (Weaver)
                                            Phone: 202-326-2914 (Zullow)
                                            Phone: 202-326-2583 (Abutaleb)
                                            E-mail: mweaver1@ftc.gov, ezullow@ftc.gov,
                                            sabutaleb@ftc.gov

                                            /s/ Gregory A. Ashe
                                            GREGORY A. ASHE (Virginia Bar No. 39131)
                                            Local Counsel
                                            Federal Trade Commission
                                            600 Pennsylvania Avenue NW
                                            Mail Stop CC-10232
                                            Washington, D.C. 20580
                                            Phone: (202) 326-3719
                                            E-mail: gashe@ftc.gov

                                            Attorneys for Plaintiff
                                            FEDERAL TRADE COMMISSION

OFFICE OF THE MARYLAND ATTORNEY GENERAL, CONSUMER PROTECTION DIVISION

*/s/ Elise Balkin Ice (with permission)*
PHILIP D. ZIPERMAN (foreign attorney registration pending)
Deputy Chief
Office of the Maryland Attorney General, Consumer Protection Division
200 St. Paul Place, 16th Floor
Baltimore, MD 21202
Phone: 410-576-6417
Email: pziperman@oag.state.md.us

ELISE BALKIN ICE (Virginia Bar No. 66518)
Local Counsel
Assistant Attorney General, Deputy Counsel
Department of Public Safety and Correctional Services
6776 Reisterstown Road, Suite 313
Baltimore, Maryland 21215
Phone: 443-531-3859
Email: elise.ice1@maryland.gov

*Attorneys for Plaintiff*
*OFFICE OF THE MARYLAND ATTORNEY GENERAL, CONSUMER PROTECTION DIVISION*

28